1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  MRW, INC., a California
    corporation; and 500 LUTHER
12  ROAD LLC, a California
    limited liability company,
13                                        NO. CIV. S-08-1732 LKK/DAD

14          Plaintiff,

15      v.                                      O R D E R

16  BIG-O TIRES, LLC, a Nevada
    limited liability company;
17  CIT SMALL BUSINESS LENDING
    CORPORATION, a Delaware
18  corporation; and DOES 1
    through 50, inclusive,
19
            Defendants.
20  _____/

21      This case arises out of a failed Big O Tires franchise.

22  Plaintiffs are MRW, Inc. and 500 Luther Rd., LLP, ("MRW" and "500

23  Luther"), two business entities tied to four members of the Platner

24  family.  Plaintiffs bring a claim against Big O Tires, LLC, under

25  California's Unfair Competition Law, and claims against CIT Small

26  Business Lending Corporation for fraud.  CIT brings a third party

                                    1

1   claim against the four family members for breach of a contract to
2   guaranty the loan.   Pending before the court are Big O and CIT's
3   respective motions for summary judgment as to all claims.   The
4   court decides the issue on the papers and after oral argument.  For
5   the reasons stated below, all three motions are granted in full.

## I. BACKGROUND[1]

7       In 2003, Wayne Platner, together with three of his family
8   members, created MRW and 500 Luther, which in turn entered a
9   franchise agreement with Big O, opened a franchise, and received
10  a loan for over $1,000,000 to purchase real property and conduct
11  the business.   The franchise was never profitable, and the
12  businesses ultimately defaulted on the loans.

13      In this suit, plaintiffs--the two business entities--claim
14  that Big O acted unfairly and fraudulently in the months following
15  Platner's initial franchise application.   Although plaintiffs'
16  precise theory of their claim as to Big O is not plain, it appears
17  that generally they argue that Big O strung plaintiffs along,
18  knowingly allowing plaintiffs to repeatedly invest resources under
19  mistaken beliefs about future events.   Plaintiffs also sue CIT
20  Small Business Lending Corporation, the lender who provided
21  plaintiffs with their primary loan.   Plaintiffs argue that CIT
22  intentionally or negligently misrepresented facts to plaintiffs in
23  connection with the loan application proceedings.   CIT has filed

24  _____

25      [1] Unless another citation is given, the following facts are
    taken from the parties' statements of undisputed facts, and are
26  therefore undisputed.

2

1 a third party complaint against the four individual members of the

2 Platner family, each of whom contracted to guarantee the loan to

3 plaintiffs.

4 　　　　Having provided this summary, the court turns to the

5 particular facts.

6 **A.    Negotiations with Big O**

7 　　　　In September of 2002, Wayne Platner began investigating the

8 opportunity to open a Big O Tires franchise in Red Bluff,

9 California.  He received a "uniform franchise offering circular"

10 from Big O on October 1, 2002, submitted an application to Big O,

11 and was accepted as a franchise candidate in December of 2002.  At

12 some point, the four Platners formed two business entities, MRW,

13 Inc., which would own and operate the franchise, and 500 Luther

14 Road LLC, which would own the real property used by the franchise.

15 MRW and 500 Luther are the plaintiffs in this suit.  Wayne Platner

16 (hereinafter "Platner") was at all times the president of MRW, and

17 was deposed as plaintiffs' Fed. R. Civ. P. 30(b)(6) designee.

18 　　　　Plaintiffs argue that Big O represented that the franchise

19 would be profitable.  Plaintiffs have provided evidence of only

20 three such representations made to plaintiffs.  Platner testified

21 that Big O employees informed plaintiffs that they would make money

22 selling tires, and that if plaintiff worked hard, he could make a

23 profit.  Deposition of Wayne Platner of July 20, 2009, (Platner

24 Depo. I) at 243, 252.  More generally, plaintiffs argue that Big

25 O's advertisements suggested that franchise buyers would "have an

26 opportunity to actually make a profit."  Id. at 191.

1    Plaintiffs concede that Big O made no representations
2    quantifying or guarantying profits or the amount of business.  The
3    uniform franchise offer circular, which Platner admits reading,
4    states that Big O does not "furnish or authorize salespersons to
5    furnish any oral or written information concerning the actual or
6    potential sales, costs, income or profits of a Big O store or
7    franchise.  Actual results vary from Store to Store, and we cannot
8    estimate the results of any particular franchise."  The circular
9    included a table that identified, on a state by state basis for
10   1999, 2000, and 2001, the number of Big O franchises, including the
11   number transferred, cancelled, terminated, etc.  This table
12   indicated that over these three years, the net number of franchises
13   in California decreased.

14   Big O and MRW contemplated that MRW would occupy a Big O store
15   that was built in 1999, but for which Big O had not been able to
16   secure a franchisee.  Platner Depo. I, 38-39.  This property was
17   owned by a separate entity not a party to this suit.  Deposition
18   of Wayne Platner of August 17, 2009, ("Platner Depo. II"), at 72.
19   Plaintiff 500 Luther would purchase the property and building, as
20   well as adjacent property on which a "Quick Lube" could be
21   constructed.  At the time of the agreement, plaintiffs understood
22   that the building had been unused for several years, and that a
23   previous Big O franchise in Red Bluff had closed in the early
24   1990s.  Platner Depo. I, 38-39.

25   On March 1, 2003, Big O and MRW entered a franchise agreement
26   licensing MRW to operate a Big O franchise and to offer and sell

4

Big O products and services in Red Bluff, CA.  This agreement included terms providing that "Franchisee understands that the business licensed under this Agreement involves business risks" and that "Franchisee acknowledges that it has not received from any representative of Big O, any warranty or guaranty, express or implied, . . . as to the potential volume, profit, income or success of the Franchised Business."  Two days later, MRW executed a closing acknowledgment regarding the agreement, which included a similar disclaimer.

**B.   Initial Franchise Operations**

Plaintiffs opened the doors on the Big O franchise on April 14, 2003.  Plaintiffs had not secured financing to purchase the real property at that time, and the franchise was therefore operating under an interim lease agreement.  Platner Depo II at 52. As part of this interim lease agreement, plaintiffs were required to pay $50,000 or $65,000 for an inventory of tires.  Id. Plaintiffs had begun receiving deliveries of equipment for the franchise on April 1, 2003.

**C.   The CIT Loan**

As the primary source of financing, Big O suggested that MRW seek a loan guaranteed by the Small Business Administration in order to finance the operation of the franchise and the purchase of the real property, and Big O suggested CIT as one possible provider of the loan.  Platner Depo I, 126, 129.  No party has called the court's attention to any evidence indicating when this suggestion was made.  Big O recommended that in order to obtain

this financing, plaintiffs retain one of two accounting firms to prepare a "pro forma" business plan.[2]  Plaintiffs retained one of these two firms, JSM Accounting of Phoenix, Arizona, who is not a party to this suit.

Plaintiffs began negotiating with a CIT employee in March or April of 2003.  Platner Depo II, 23.  As part of the loan application process, plaintiffs provided a $200,000 deposit.  Plaintiffs and CIT ultimately negotiated a "blended" loan, which would finance both the purchase of the real property and would provide funds for improvements, working capital, and other expenses.  Platner testifies that Big O and CIT initially indicated to plaintiffs that the loan would fund purchase of fee title to the property and its improvements, construction of the quick lube, and provision of $75,000 in working capital.  Platner Depo I at 149-150, Platner Depo. II at 18, 23-25, 29, 33-35.

During the loan process, Big O communicated to CIT the prices for certain equipment that would be sold to plaintiffs in connection with the franchise.  Platner Depo. I, 153.  CIT's "Small Business Lending Corporation Credit Write Up" also states that Big O employees represented to CIT that Big O believed the subject site would be successful.  Declaration of Oliver R. Guiterrez in Support of Plaintiffs' Opposition to Defendant Big-O Tires' Motion for

_____

[2] A pro forma document is one "provided in advance to describe items, predict results, or secure approval."  Black's Law Dictionary, Eighth Ed., 1247 (2004).  The parties have not further defined the term in this context.

Summary Judgment ("Guiterrez Decl. I"), Ex. D, 2.[3]

CIT represented that the loan approval process and the loan itself would comply with SBA guidelines, and specifically, that the pro forma business plan and appraisal were proper. Platner Depo. II at 10-11, 39-40. As noted above, the pro forma was prepared by a third party firm selected and hired by plaintiffs, and was provided by plaintiffs to CIT. The appraisal was performed by an independent appraiser hired by CIT, and was completed in July 2003. The appraisal concluded that the property was worth $1,038,000.

Plaintiffs argue that CIT performed little review of the appraisal before approving the loan. In the deposition of Raymond Cantwell, the Fed. R. Civ. P. 30(b)(6) representative for CIT, Cantwell stated that he did not have personal knowledge of what kind of review had occurred in this case. In 2003, CIT's policy allowed an appraisal to be approved with a "verbal" from an appraiser, although CIT's standard procedure was to review the written appraisal. Deposition of Raymond Cantwell, 54, 97. The parties have not directed the court to any other evidence on this issue. Nor have the parties provided any discussion as to what a "verbal" approval is.[4]

After the appraisal, CIT offered plaintiffs an SBA guaranteed

---

[3] Plaintiffs also cite to page 7 of this document, but the document provided by plaintiffs contains only three pages.

[4] In their opposition, plaintiffs additionally cite pages 52, 92, and 96 of the Cantwell deposition. Plaintiffs have not, however, provided these pages of the deposition to the court. Plaintiffs' opposition memorandum suggests that these missing pages do not contain information beyond that described above.

1  loan for $1,172,000.  This amount included $175,000 for equipment,

2  $36,649 for working capital, and no funding for construction or for

3  tires and other inventory.  Plaintiffs were aware that the loan

4  they were offered provided only these things, and accepted the loan

5  despite the fact that it covered less than what plaintiffs argue

6  they had previously been told it would contain.

7      **2.    Security and Guaranty for the CIT Loan**

8      CIT conditioned its offer of the loan on provision of various

9  securities by the plaintiff/borrowers and of guaranties by the four

10 members of the Platner family, which were executed with the loan.

11 The security agreements between CIT and the plaintiffs/borrowers

12 are not at issue in this case.

13     The guaranty agreements provide that each

14         Guarantor unconditionally guarantees payment
           to Lender of all amounts owing under the Note.
15         This Guarantee remains in effect until the
           Note is paid in full.  Guarantor must pay all
16         amounts due under the Note when Lender makes
           written demand upon Guarantor.  Lender is not
17         required to seek payment from any other source
           before demanding payment from Guarantor.

18
   The guaranty agreements further provide that the guarantors waive
19
   various defenses, including any claim that:
20
           11)  Lender made errors or omissions in Loan
21         Documents or administration of the Loan;

22         12)  Lender did not seek payment from the
           Borrower, any other guarantors, or any
23         Collateral before demanding payment from
           Guarantor; . . .
24
           15)  Borrower has avoided liability on the
25         Note ...

26 The guaranty agreements were signed by the four guarantors, and

8

1   their authenticity is undisputed.

2   **D.   The Tire Loan**

3          Plaintiffs argue that Big O represented that a second source

4   of financing was available, separate from the CIT loan.

5   Specifically, at some point before plaintiffs began the CIT loan

6   application process, Greg Roquet, a Big O employee, had indicated

7   to Platner that if the CIT loan was problematic, Big O could

8   provide a $50,000, five year loan to finance the purchase of tires.

9   Platner Depo I, 131-32.  Platner conceded in his deposition that

10  this offer was never made in writing, and was not a binding

11  commitment.   Platner Depo I, 131-33.   Moreover, the "uniform

12  franchise offering circular" plaintiffs received explicitly stated

13  that Big O would provide or assist in financing at its own

14  discretion.

15         In August of 2003, plaintiffs learned that Big O would not

16  provide such a loan.  Plaintiffs argue that this was because Big

17  O was itself unable to secure a loan.  In order to provide funding

18  for the purchase of inventory, plaintiffs instead took out, at Big

19  O's suggestion, a $50,000 two year loan from a separate lender.

20  Platner Depo. I, at 167-68.

21  **E.   Quick Lube**

22         Plaintiffs initially planned to construct a "Quick Lube"

23  franchise on the property adjacent to the Big O business.  Platner

24  stated in his deposition that at some point, Big O informed

25  plaintiffs that construction of a quick lube would cost "about

26  $250,000," but that "[l]ater, when we actually got specific

9

1  information . . . the price of a quick lube was going to be a whole
2  lot closer to like $400,000." Platner Depo I, 244-45. Nothing
3  specifies when the two estimates were provided. Plaintiffs
4  acknowledge that they did not themselves look into the actual costs
5  associated with building the quick lube. Id. at 119-22.

6  **F.   Default and Forbearance on The CIT Loan**

7  Plaintiffs began missing payments on the CIT loan in August
8  of 2005. CIT sent plaintiffs a demand letter on October 26, 2005,
9  notifying plaintiffs of the defaults and demanding immediate
10 repayment of the loan. Despite the demand letter, plaintiffs did
11 not cure the defaults.

12 On July 13, 2006, plaintiffs and CIT entered into two separate
13 Forbearance Agreements. In these agreements, plaintiffs MRW and
14 500 Luther stated that neither of them had any claims against CIT,
15 or any offsets or defenses as to the loans. The forbearance
16 agreements further provided that the borrowers and guarantors
17 released any and all claims against CIT in any way connected with,
18 arising out of or related to the loan documents, excluding only
19 those claims caused solely by CIT's gross negligence or willful
20 misconduct.

21 Plaintiffs again failed to make payments, breaching their
22 obligations under the forbearance agreements. CIT completed a non-
23 judicial foreclosure on the real property securing the loan on
24 March 10, 2008. At this sale, CIT purchased the real property for
25 $600,000, which CIT applied to the outstanding amount on the loan.
26 However, even after application of the $600,000, approximately

1  $647,617.48 remains owing under the loan documents as of September

2  9, 2009.

3  **II. STANDARD FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

4      Summary judgment is appropriate when it is demonstrated that

5  there exists no genuine issue as to any material fact, and that the

6  moving party is entitled to judgment as a matter of law.  Fed. R.

7  Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157

8  (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467

9  (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr</u>

10 <u>v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th

11 Cir. 1984).

12      Under summary judgment practice, the moving party

13          [A]lways bears the initial responsibility of
            informing the district court of the basis for
14          its motion, and identifying those portions of
            "the pleadings, depositions, answers to
15          interrogatories, and admissions on file,
            together with the affidavits, if any," which
16          it believes demonstrate the absence of a
            genuine issue of material fact.
17

18 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the

19 nonmoving party will bear the burden of proof at trial on a

20 dispositive issue, a summary judgment motion may properly be made

21 in reliance solely on the 'pleadings, depositions, answers to

22 interrogatories, and admissions on file.'"  <u>Id</u>.  Indeed, summary

23 judgment should be entered, after adequate time for discovery and

24 upon motion, against a party who fails to make a showing sufficient

25 to establish the existence of an element essential to that party's

26 case, and on which that party will bear the burden of proof at

1  trial.  Id. at 322.  "[A] complete failure of proof concerning an

2  essential element of the nonmoving party's case necessarily renders

3  all other facts immaterial."  Id.  In such a circumstance, summary

4  judgment should be granted, "so long as whatever is before the

5  district court demonstrates that the standard for entry of summary

6  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

7      If the moving party meets its initial responsibility, the

8  burden then shifts to the opposing party to establish that a

9  genuine issue as to any material fact actually does exist.

10  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

11  586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391

12  U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d

13  1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

14      In attempting to establish the existence of this factual

15  dispute, the opposing party may not rely upon the denials of its

16  pleadings, but is required to tender evidence of specific facts in

17  the form of affidavits, and/or admissible discovery material, in

18  support of its contention that the dispute exists.   Rule 56(e);

19  Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at

20  289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).   The

21  opposing party must demonstrate that the fact in contention is

22  material, i.e., a fact that might affect the outcome of the suit

23  under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

24  242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec.

25  Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

26  dispute is genuine, i.e., the evidence is such that a reasonable

12

1  jury could return a verdict for the nonmoving party, <u>Anderson</u>, 242

2  U.S. 248-49; <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

3  (9th Cir. 1987).

4       In the endeavor to establish the existence of a factual

5  dispute, the opposing party need not establish a material issue of

6  fact conclusively in its favor. It is sufficient that "the claimed

7  factual dispute be shown to require a jury or judge to resolve the

8  parties' differing versions of the truth at trial." <u>First Nat'l</u>

9  <u>Bank</u>, 391 U.S. at 290; <u>T.W. Elec. Serv.</u>, 809 F.2d at 631. Thus,

10 the "purpose of summary judgment is to 'pierce the pleadings and

11 to assess the proof in order to see whether there is a genuine need

12 for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P.

13 56(e) advisory committee's note on 1963 amendments); <u>International</u>

14 <u>Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405

15 (9th Cir. 1985).

16      In resolving the summary judgment motion, the court examines

17 the pleadings, depositions, answers to interrogatories, and

18 admissions on file, together with the affidavits, if any. Rule

19 56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC v. Seaboard Corp.</u>, 677 F.2d

20 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party

21 is to be believed, <u>Anderson</u>, 477 U.S. at 255, and all reasonable

22 inferences that may be drawn from the facts placed before the court

23 must be drawn in favor of the opposing party, <u>Matsushita</u>, 475 U.S.

24 at 587 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

25 (1962) (per curiam)); <u>Abramson v. University of Hawaii</u>, 594 F.2d

26 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn

13

1    out of the air, and it is the opposing party's obligation to

2    produce a factual predicate from which the inference may be drawn.

3    Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D.

4    Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

5         Finally, to demonstrate a genuine issue, the opposing party

6    "must do more than simply show that there is some metaphysical

7    doubt as to the material facts. . . . Where the record taken as a

8    whole could not lead a rational trier of fact to find for the

9    nonmoving party, there is no 'genuine issue for trial.'"

10   Matsushita, 475 U.S. at 587 (citation omitted).

**III. ANALYSIS**

12   **A.   Plaintiff's Unfair Competition Claim Against Big O**

13        Plaintiffs' sole claim against Big O is brought under

14   California's Unfair Competition Law, California Business and

15   Professions Code section 17200 et seq. ("UCL"). The UCL prohibits

16   "unlawful, unfair or fraudulent business act or practice" and

17   "unfair, deceptive, untrue or misleading advertising," as defined

18   by Cal. Bus. & Prof. Code § 17500. Broadly speaking, plaintiffs

19   argue that Big O acted fraudulently by representing or intimating

20   that the franchise would be profitable, and that Big O acted

21   fraudulently and unfairly in representations and acts related to

22   the financing of the franchise. The court concludes that

23   plaintiffs have not provided any evidence indicating that Big O

24   made a fraudulent representation regarding profitability, and that

25   insofar as plaintiffs' claim is based on any other act, the claim

26

1  is barred by the UCL's four year statute of limitations.[5]   The
2  court therefore grants Big O's motion for summary judgment.

3      **1.   Representations Regarding Profitability**

4      Plaintiffs argue that various representations regarding the
5  expected profitability of the franchise were fraudulent or
6  deceptive for purposes of the UCL.   Plaintiffs do not argue that
7  this conduct was "unlawful" or "unfair."   The evidence provided by
8  plaintiffs does not raise a triable question of material fact as
9  to these claims.

10      A business practice is fraudulent if "members of the public
11  are likely to be deceived."   <u>Committee on Children's Television,</u>
12  <u>Inc. v. General Foods Corp.</u>, 35 Cal. 3d 197, 211 (1983).   Pursuant
13  to the amendments to the UCL enacted in 2004, a plaintiff must
14  prove that the "misrepresentations were an immediate cause of the
15  injury[]," although a plaintiff need not prove that "those
16  misrepresentations were the sole or even the decisive cause."   <u>In</u>
17  <u>re Tobacco II Cases</u>, 46 Cal. 4th 298, 328 (2009).

18      Notably, plaintiffs have retreated from the allegations made
19  in their complaint.   Plaintiffs' complaint alleges that Big O has
20  engaged in the sale of franchises "that it knows or should know,

21

_____

22      [5] Big O also argues that the statute of limitations also bars
23  plaintiffs' claim regarding representations of profitability.
Plaintiffs have implicitly invoked a tolling argument as to this
theory of liability, arguing that plaintiffs could not be sure that
24  representations were inaccurate until the business had been in
operation for two years.   The court does not evaluate these
25  arguments, instead disposing of the profitability theory on the
merits.
26      CIT has not raised a statute of limitations argument.

will not succeed based upon faulty market data and business plans which it offers to the public," and that Big O's marketing represents that franchises will "perform and operate at a certain level," but that these representations are based on inaccurate data and constitute an effort "to fool the public into buying into [Big O's] scheme." First Amended Complaint ¶¶ 64, 65. No evidence indicates that Big O represented that the franchise would perform at a "certain level" of profit, volume, income, or anything else. Nor does any evidence indicate that Big O knew or should have known that the franchise sold to plaintiffs would fail, or that any other franchise would fail.

Instead, plaintiffs provide evidence of much more restrained representations, which no trier of fact could find deceptive, and even this evidence consists solely of Platner's deposition testimony. Platner states that Big O employees represented that plaintiffs could make money, and that if plaintiffs worked hard and put their time in, they could make a profit. These representations, even if made, would not deceive a member of the general public into believing that a profitability was certain. In the context of a California common-law fraud claim, the Ninth Circuit has held that "generalized, vague and unspecific assertions, constitut[e] mere 'puffery' upon which a reasonable consumer could not rely." Glen Holly Entm't, Inc. v. Tektronix Inc., 343 F.3d 1000, 1015 (9th Cir. 2003). Several district courts have held that such puffery cannot support a claim for fraudulent business practices under the UCL. Oestreicher v. Alienware Corp.,

1  544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (granting defendant's

2  motion to dismiss), <u>Annunziato v. eMachines, Inc.</u>, 402 F. Supp. 2d

3  1133, 1139 (C.D. Cal. 2005) (dismissal proper when fraudulent

4  business practice claim based on puffery).  Here, where the

5  evidence only indicates statements regarding the possibility of

6  profit, where plaintiffs acknowledge that they knew that no formal

7  guarantees were being made, and where plaintiffs stated, in

8  multiple written agreements, that they had not received any

9  predictions or guarantees of profitability, no reasonable consumer

10 in plaintiffs' position could have been deceived.

11         **2.   Conduct Regarding Financing**

12         Plaintiffs also argue that Big O acted fraudulently and

13 unfairly with regard to the initial negotiation and financing of

14 the business.  Plaintiffs argue that Big O was fraudulent in

15 assuring plaintiffs that the CIT would offer plaintiffs a more

16 expansive loan than was actually offered, that Big O would provide

17 a $50,000, five year loan if needed, and that a quick-lube could

18 be constructed for $250,000.  Plaintiffs separately argue that Big

19 O acted unfairly in refusing to provide the $50,000 loan and in

20 billing plaintiffs for tires and equipment prior to completion of

21 the CIT loan.

22         Insofar as plaintiffs' UCL claim is based on these acts, it

23 is barred by the statute of limitations.  The statute of

24 limitations under the UCL is four years from the date of accrual

25 of the action.  Cal. Bus. & Prof. Code § 17208.  Even if the court

26 assumes that the cause of action does not accrue until the facts

1  underlying the claim are discovered, such delayed discovery would
2  not save plaintiffs.   Plaintiffs argue that they did not know of
3  an alleged conspiracy between Big O and CIT until some time after
4  July of 2004.  The only evidence provided by plaintiffs to support
5  this conspiracy claim, however, is evidence that was known to
6  plaintiffs on or before August of 2003.  Plaintiffs simply argue
7  that Platner did not get the "feeling" that a conspiracy existed
8  until a later point.  Moreover, all of the other evidence provided
9  in support of plaintiffs' claims against Big O was also known to
10  plaintiffs in 2003.

11      Plaintiffs filed the instant suit on July 27, 2008.  The
12  actions underlying this claim occurred in 2003.  Plaintiffs have
13  not shown that the limitations period should be tolled, or that
14  discovery of the basis for their claims was delayed into 2004.
15  Accordingly, these claims are time barred.

16  **B.   Plaintiffs' Fraud Claims Against CIT**

17      Plaintiffs bring claims against CIT for intentional and
18  negligent misrepresentation, arguing that CIT misrepresented that
19  it would comply with Small Business Association guidelines, and
20  that CIT misrepresented, at the beginning of the application
21  process, that plaintiffs would be offered a larger loan than the
22  one CIT ultimately offered.  Plaintiffs have not tendered evidence
23  sufficient to demonstrate that either of the representations, if
24  made, was an actionable intentional or negligent misrepresentation.

25      The elements of a claim for fraud are "(a) misrepresentation
26  (false   representation,   concealment,   or   nondisclosure);   (b)

18

knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." Engalla v. Permanente Medical Group, Inc., 15 Cal. 4th 951, 974 (1997).  A claim for negligent misrepresentation shares the same elements, save that absence of reasonable grounds for believing a statement to be true, rather than actual knowledge of falsity, suffices for the second element. Fox v. Pollack, 181 Cal. App. 3d 954, 962 (1986).

As to the arguments regarding the SBA guidelines, plaintiffs have failed to provide evidence of the first element, falsity of the representations.  The court assumes that the guidelines required CIT to evaluate the appraisal and pro forma.[6] Interpreting the evidence in the light most favorable to the non-moving parties, CIT represented that it was an SBA lender who would follow SBA guidelines, and thereby implicitly represented that the appraisal and pro forma were accurate and proper.  No evidence indicates that any of these representations were false.  Plaintiffs have not provided any evidence indicating that the appraisal was inaccurate, or that the pro forma was somehow defective.[7]

_____

[6] Plaintiffs have not provided any evidence of or citation to these guidelines and their contents.  This failing is itself likely fatal to plaintiffs' claims.  While the court disposes of the claims on other grounds, nothing in this opinion should be interpreted as a statement regarding the SBA guidelines' actual contents or requirements.

[7] While it could be the case that the appraisal and pro forma were both entirely accurate but that CIT nonetheless misrepresented the degree to which CIT reviewed them, plaintiffs have not provided any evidence or legal theory as to how the misrepresentation in this scenario would cause harm to plaintiffs.

Plaintiffs further argue that the guidelines required that CIT consider plaintiffs' other indebtedness. Plaintiffs have not directed the court to any evidence indicating that CIT failed to do so, other than Platner's statement in a deposition that he believed CIT to have ignored this issue. This unsupported statement is insufficient to raise a triable issue. Thus, no evidence indicates that CIT failed to comply with SBA guidelines. Even if CIT represented that it would comply with these guidelines, there is not a triable question as to whether that representation was false. Plaintiffs' misrepresentation claims cannot proceed on this theory.

Plaintiffs' separate theory concerns representations made by CIT in the beginning of the loan application process, regarding the anticipated scope of the loan. Some evidence indicates that in April of 2003, CIT represented that plaintiffs would be offered a loan that would pay for all equipment that had been shipped to the store, provide $75,000 in working capital, provide funds for construction of the quick lube, and finance the full purchase of the real property. Platner Depo. II at 18, 23-25, 29, 33-35. After the appraisal and approval processes were completed, however, CIT offered plaintiffs a loan for $1,172,000, of which $175,000 could be used for equipment, only $36,649 could be used for working capital, and no funds could be used for construction or for tires

---

Although tangential to plaintiffs' claim, the court notes that the pro forma was prepared by a third party firm selected and hired by plaintiffs, not by CIT.

1  and other inventory.  Plaintiffs concede that at the time the loan

2  was offered, CIT accurately represented the offer.

3      Although Platner testifies that CIT represented that a larger

4  loan would be approved in the spring of 2003, no evidence indicates

5  that CIT knew, should have known, or lacked a reasonable basis for

6  believing that any such representation to be false at that time.

7  Plaintiffs bear the burden of proof on this issue.  Accordingly,

8  there is not a material question as to this claim.  The court does

9  not address whether plaintiffs have provided evidence of the

10  remaining elements of a misrepresentation claim.

11

12 **C.   CIT's Claim against the Guarantors**

13      CIT separately moves for summary judgment on its claim that

14  the four members of the Platner family are in breach of their

15  contract to guaranty the loan.  The only argument offered by the

16  guarantors in opposition to this motion is that the borrowers'

17  obligation to CIT may be offset by success on the claims presented

18  in this suit.  Because the court grants summary judgment to CIT on

19  these claims, this argument is without merit.[8]

20      CIT has otherwise demonstrated that it is entitled to summary

21  judgment on this claim.  An action for breach of guaranty is a

22  species of claim for breach of contract.  Torrey Pines Bank v.

23  Superior Court, 216 Cal. App. 3d 813 (1989).  A claim for breach

24  ————————————

25    [8] The court does not decide whether, if plaintiffs' claims
26  against CIT could proceed, these claims would limit CIT's ability
 to recover from the guarantors.

1  of contract includes four elements: that a contract exists between
2  the parties, that the plaintiff performed his contractual duties
3  or was excused from nonperformance, that the defendant breached
4  those contractual duties, and that plaintiff's damages were a
5  result of the breach. <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d
6  822, 830 (1968); <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal.
7  App. 4th 731, 745 (2001).

8      CIT has provided evidence demonstrating that the contracts
9  exist.  CIT has introduced the agreements themselves, which were
10 authenticated by the guarantors in their depositions.  CIT
11 performed its obligations, namely, paying a $1,172,000 loan to MRW
12 and 500 Luther.  MRW and Big O breached the contract by falling
13 into default on the loan, and the guarantors breached their
14 obligations under the guaranties by failing to pay the amounts owed
15 to CIT.  Although CIT has limited its damages by recovering from
16 other sources, namely foreclosure on the real property, an
17 additional $647,000 in damages remains.[9]

18                        **IV. CONCLUSION**

19     For the reasons stated above, the three summary judgment
20 motions (Doc. Nos. 83, 84, 85) are GRANTED.  All of plaintiffs'
21 claims as to Big O and CIT are denied.  CIT is GRANTED summary
22 judgment as to its claim against the third party defendants.

23

24
    ───────────────
25     [9] Not only has CIT provided evidence as to each of these
   issues, but the guarantors failed to respond to CIT's statement of
26 undisputed facts filed in connection with this motion.

                                22

IT IS SO ORDERED.

DATED:  October 16, 2009.

_____
LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT